UNITED STATES *v.* STAFFORD.

(*District Court, E. D. Arkansas.* October Term, 1883.)

1. INTERNAL REVENUE—SALE OF DISTILLED SPIRITS AND WINES.
    Distilled sqirits and wines cannot lawfully be sold in any quantity, or for any purpose, by any person who has not paid the special tax required by law.

2. SAME—SALE BY PHYSICIANS AND DRUGGISTS.
    The law does not treat distilled spirits as a drug or medicine, and doctors and druggists are not privileged to sell it as such without first paying the special tax required of dealers in liquor.

3. SAME—SALE OF PACKAGES CONTAINING DISTILLED SPIRITS—SPECIAL TAX.
    Where packages contain distilled spirits in a form to be got at by squeezing, suction, or any other process, and the spirits, and not the fruit, or other ingredients contained in the packages, is the inducement to their sale, purchase, and use, one selling such packages must pay a special tax as liquor dealer.

This was a criminal information filed by the United States attorney charging the defendant with selling liquors at retail without payment of the special tax. The defendant plead not guilty. By the proofs it appeared that the defendant conducted business in a one-story frame building in the town of Clarendon. That the room had been used as a saloon until the state local option law suppressed saloons in Clarendon, since which time it had been used as a billiard-hall, in the rear part, and in front several articles were sold behind a bar, among them tobacco, cigars, sardines, and chiefly "brandy cherries." Several witnesses testified as to the contents of the bottles alleged to contain "brandy cherries," as appeared by the printed labels pasted thereupon, and the method of dealing in them. They stated that the bottles, when purchased, were almost invariably opened at once on the counter, and the contents were not eaten, but drank upon the spot; that the bottles were usually opened by the customer, but in some instances had been opened by defendant or his clerk or bartender; that the "cherries" were usually left behind, and was sometimes thrown out for the hogs. In one instance, the "cherries," after the liquor had been drank up, were given to the deputy sheriff, upon the suggestion that his prisoners in the county jail near by might like them for their stimulating qualities. The witnesses testified that the liquid contained in the bottles was whisky,—one witness, that it was mean whisky, and another witness that he drank several drinks of it and it made him "very drunk," and that he saw other persons made drunk by drinking the contents of such bottles. The witnesses also testified that they bought the bottles for the liquor they con-

tained, and not on account of the fruit, and that they knew of no one purchasing them for any other reason. It also appeared in testimony that there was no trade in Clarendon in these articles until after prohibition had been established, and since the decision of the supreme court (*Rabe* v. *State*, 39 Ark. 204) on the subject of "brandy peaches."

Chas. C. Waters, U. S. Atty., for plaintiff.

S. P. Hughes, for defendant.

CALDWELL, J., (*charging jury*.) A portion of the revenue to support the government and pay the public debt is derived from a tax on distilled spirits, and a license tax imposed on dealers therein. The act of congress provides that "every person who sells or offers for sale foreign or domestic distilled spirits or wines, in any less quantities than five gallons at the same time, shall be regarded as a retail dealer in liquors;" and persons engaging in that business are required to pay a license tax to the United States at the rate of $25 a year. You will observe this license tax is required of "every person who sells or offers for sale foreign or domestic distilled spirits or wines." The quantity sold, whether a gill or a gallon, or the purpose for which it is sold, whether as a beverage or a medicine, or for any other purpose, is not material. Distilled spirits or wines cannot be sold in any quantity, or for any purpose, by any person who has not paid the required special tax. It is a popular error that doctors or druggists can sell liquors without paying the special tax. Doctors and druggists have no greater privileges in this business than other people. The law does not treat liquor as a drug or medicine. If a doctor prescribes liquor for a patient, neither he nor a druggist can sell the liquor to fill such prescription unless he has paid the special tax required of liquor dealers.

In this state there seems to be a strong incentive to evade the payment of the license tax. The state has a local option law combined with a high license. Under the operation of the local option law it is unlawful to sell liquor for any purpose in many localities; and where prohibition does not prevail it is unlawful to sell without the payment of a high license to the state, county, and towns, amounting in the aggregate from $600 to $1,000 a year. The United States laws require dealers who have paid their special tax for the privilege of selling liquor to "place and keep conspicuously in his establishment or place of business" the license which he receives from the United States collector. The state law provides that the finding in any house, room, or place of business of such a license shall be *prima facie* evidence that the person doing business in the house is selling liquor in violation of the state law, unless he has a state license. It will thus be seen that there is a strong motive on the part of those selling in violation of the state law to evade the payment of the license tax required by the laws of the United States, not so much on account of the amount of the United States tax as the effect of its

payment in discovering them to the state authorities. The result is that numerous fraudulent devices have been resorted to from time to time to evade the payment of the license tax to the United States and the state, or to escape the payment of the license tax to the United States, and sell in prohibition districts in violation of the state law.

You have all heard of "blind tigers." One of the most common of these fraudulent devices is to put a few drugs, barks, or extracts into very common liquor and put it on the market for sale as a pretended medicine, under the name of "cordial," "tonic," or "bitters." "Hostetter's Bitters," "Fitzpatrick's Bitters," "Home Bitters," "Home Sanitive Cordial," "Reed's Gilt-Edge Tonic," and other compounds were of this character, and have all rightly been adjudged to be mere shams as medicines, because they were sold and used as intoxicating beverages, and for the liquor, and not for the drugs and barks they contained; and dealers in them have been dealt with precisely as if they had sold plain whisky without any disguise. *Williams* v. *State*, 35 Ark. 430; *Foster* v. *State*, 36 Ark. 258; *Gostorf* v. *State*, 39 Ark. 450; *U. S.* v. *Cota*, 17 Fed. Rep. 734. Mere names go for nothing. The law cuts through frauds and shams of every character, and regards only the substance of things.

The so-called "brandy peaches" and "brandy cherries" seem to be the latest and most popular device for dealing in spirits without paying the special tax. This is particularly the case in the districts in which the sale of liquor is prohibited by state law. The witnesses tell you there is little or no demand for these articles in localities where there are licensed dealers in liquor, and where it can be had without the incumbrance of peaches or cherries. The introduction of peaches or cherries into liquor does not necessarily change its character any more than did the introduction of drugs in the cases of the "tonics" and "bitters" which I have mentioned. There is probably not a package of genuine brandied peach or cherry preserves in the state, outside of those put up by housewives for family use. Between the genuine brandied peach or cherry preserves put up for legitimate domestic use as confectionery, and the so-called "brandy cherries," described by the witnesses in this case, and sold by the defendant, there is not the faintest resemblance. One is an edible and palatable preserve, and used as such; the other, as the proof shows, is neither edible nor palatable, and is not used as a preserve or for food, but as a stimulating beverage, and for the spirits it contains. The method of making brandied peach preserves is laid down in the standard authorities on the subject of the preservation of food. The fruit, after being properly prepared, is boiled in a syrup made of refined sugar, and is then placed in a bottle, the syrup poured over it, and a sufficient quantity of pure, pale brandy added to impart to it the desired brandy flavor, just as brandy is used as an ingredient in our pudding sauce or mince pies, for the purpose of improving their flavor. It is obvious the defendant sold no such preserves. Alcohol is used to

preserve specimens of fruits for exhibitions at fairs, or to advertise the products of the country, but fruits so preserved are not put up for sale, and are not known in the trade.

It is quite clear the so-called brandy cherries described by the witnesses in this case are not an edible preserve, and are not put up for ornament. What, then, is the proper definition of the brandy peaches and brandy cherries now so popular in the prohibition districts in this state? If they are not used as confectionery, nor as food, nor for ornament, what is their use? I know not what definition you gentlemen may give of them, and it rests with you to define them in the light of the evidence; but from the proof in the case, I confess it seems to me the proper definition would be: a compound of drugged whisky and poor peaches or cherries, the fruit being added as a mere disguise, and with a view to evade the payment of the license tax imposed on liquor dealers by the United States, and to escape the penalties of the state law for selling liquor in districts where its sale is prohibited. I repeat that the quantity of liquor sold is not material, nor is the size, form, or chemical composition of the vessel or other thing that contains the spirits material. If a cocoa-nut or gourd was filled with spirits and labeled brandy cocoa-nut or brandy gourd, it would be idle to say that one selling liquor in that way could escape payment of the license tax. So, if one were to stuff sponges in bottles and then fill them with liquor and label them brandy sponges, he could not escape payment of the tax on the plea that the sponges absorbed the liquor and that there was therefore no liquor in the bottles. Such a plea would not be entitled to respectful consideration. It is then wholly immaterial whether the liquor sold is contained in a bottle, cocoa-nut, gourd, sponge, peach, or cherry, or what label is put upon it, if the package contains distilled spirits in a form to be got at by squeezing, suction, or any other process, and the spirits in the package, and not the other ingredients, are the inducement to its sale and purchase.

To sum up the law applicable to the case, I instruct you that if you find from the evidence that the bottles of so-called "brandy cherries," sold by the defendant, contained whisky or other distilled spirits, and that they were purchased by his customers, not for the fruit in them, but on account of the distilled spirits they contained, and for the purpose of using the spirits contained therein as a beverage, and that the contents of the bottles were in fact used as a beverage, and for the purpose of obtaining the effects produced by the use of intoxicating liquor, and that such effects were in fact produced by their use, and that the defendant knew these facts,—then you will find him guilty. If you find these facts, it makes no difference whether the defendant opened the bottles or not when he sold them, nor whether the purchaser drank the contents of the bottle at the defendant's counter or took it elsewhere for that purpose, and it makes no difference that the bottles were sealed up, and that the sales were made in what has been spoken of in the course of the trial as original packages.

I have discussed with you the facts and the law bearing on this case at greater length than is usual in cases of no more importance, because your verdict will probably be accepted as settling all other cases of like character. Of course, you understand you are the sole judges of the facts in the case, and that any fair or reasonable doubt in your minds as to the defendant's guilt should be resolved in his favor.